UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SYLVIA REYES,

                Plaintiff,

    -against-

NORTH SHORE – LONG ISLAND JEWISH
HEALTH SYSTEM,

                Defendant.
-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 00-CV-6400 (FB) (RML)

*Appearances:*
*For the Plaintiff:*
SYLVIA REYES, *pro se*
536 East 85th Street
New York, NY 10028

*For the Defendant:*
MARK A. GLOADE, ESQ.
North Shore – Long Island Jewish Health
System, Office of Legal Affairs
150 Community Drive
Great Neck, NY 11021

**BLOCK, District Judge:**

       In this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, plaintiff, Sylvia Reyes ("Reyes"), proceeding *pro se*, claims that she was constructively discharged from her position as a medical resident at North Shore University Hospital because she is Filipino.[1] Pursuant to Federal Rule of Civil Procedure 56, North Shore moves for summary judgment on the grounds (1) that Reyes has failed to make out a *prima facie* case, and (2) that she has failed to establish that North Shore's non-

---

[1] Although Reyes was employed by North Shore University Hospital, she has sued a separate entity, the North Shore – Long Island Jewish Health System, of which the hospital is only a part. For purposes of this Memorandum and Order, the distinction is immaterial; therefore, the Court will refer to both entities collectively as "North Shore."

discriminatory reasons for its actions were pretextual. For the following reasons, the Court grants the motion.

## BACKGROUND[2]

### I.

Born in the Phillippines, Reyes immigrated to the United States with her family in 1984 and later became a U.S. citizen. Between 1996 and 1999, she completed a three-year residency in general psychiatry at Bronx-Lebanon Hospital Center ("Bronx-Lebanon"). As that residency was nearing its completion, she applied for a position as a first-year resident in North Shore's child and adolescent psychiatry ("CAP") program. Four doctors from Bronx-Lebanon wrote favorable letters recommending her for the position.

Reyes was interviewed by Dr. Victor Fornari ("Fornari") and two other doctors; Fornari, who is the director of the CAP program, was aware of Reyes' Filipino heritage when he interviewed her. Fornari offered positions to Reyes and two others: Dr. Gianlucca LaMonaca ("LaMonaca") and Dr. Ameer Dahar ("Dahar"); all three accepted.

Reyes began work at North Shore on July 1, 1999. On her first day, she arrived two hours late for orientation. Dr. LaMonaca did not attend orientation because

---

[2]The following background is taken from North Shore's Rule 56.1 Statement, the material supporting that statement, and Reyes' "Affidavit in Opposition." Although North Shore provided Reyes with the required notice to *pro se* litigants opposing motions for summary judgment, *see* Local Rule 56.2, she did not submit a Rule 56.1 Statement. Because she is proceeding *pro se*, however, the Court will consider Reyes' submission to the extent that it is based on personal knowledge or otherwise admissible evidence. The facts presented are either undisputed or, if disputed, stated in the light most favorable to Reyes.

he was on vacation in Italy; Dr. Dahar did not attend because he was not scheduled to begin his residency until the following month.

Doctors at North Shore were assigned to supervise the residents' training. Reyes' supervisors were Dr. Shirley Papilsky ("Papilsky"), Dr. Beverly Goodman ("Goodman"), Dr. Allan Stempler ("Stempler") and Dr. Paulina Loo ("Loo"); other doctors also oversaw her work. Fornari had overall responsibility for the residents' training.

During the first three months of her residency, Reyes' supervisors voiced concerns about her time-management skills, participation in class and clinical performance. On September 27, 1999, after meeting with her supervisors, Fornari sent Reyes a memorandum listing the concerns:

1. Supervisors reported that you had missed supervision with significant frequency, often without canceling.

2. That despite supervision, a number of supervisors reported that you did not follow the recommendations of the supervision regarding your clinical work.

3. It was reported that while completing an emergency evaluation in the North Shore Emergency Room with an attending, that you left before the evaluation was completed in order to catch your bus home.

4. One supervisor reported that while you were evaluating a case with him, you made a phone call as if you weren't in the process of a consultation.

5. A general concern regarding your clinical style, including poor eye contact and giggling.

6. A serious concern regarding the way you handled the case of an adolescent girl who was contemplating termination of pregnancy.

Fornari Aff., Ex. 2.

3

Based on these concerns, North Shore placed Reyes on academic probation for three months. Fornari's September 27 memorandum set out the terms of the probation:

1. You will meet with me on a weekly basis to review your progress.

2. You will discuss your progress with each of your supervisors on a weekly basis.

3. You will attend supervision, as well as your classes in an organized and regular fashion. If for some reason you need to miss a class or a supervision, you are to inform me as well as the supervisor.

4. The purpose of this corrective active plan is [to] help you function and to evaluate your continued participation in this training program.

*Id.*

Reyes' supervisors continued to report problems with her performance to Fornari. On October 1, 1999, Reyes missed a scheduled supervision with Papilsky; Reyes told Fornari that she forgot about the supervision because she had trouble with time management.

On October 21, 1999, Loo reported that Reyes' handling of one of her cases had resulted in an irate call from the patient's grandmother; Loo scheduled a supervision to discuss the case, but Reyes failed to show up. According to Loo,

> [Reyes] is often late or forgets about supervision. When she comes to supervision she often does not know whether she is to discuss evaluations, psychopharm, family crisis cases.
>
> I have tried to help her organize her thoughts, and even tell her specifically what to do in her meetings with patients, but she seem to have tremendous difficulty obtaining information for diagnosis.

Fornari Aff., Ex. 3.

On October 24, 1999, Goodman reported that Reyes had missed supervisions

4

without canceling, and that she often failed to return phone calls and pages. Regarding Reyes' performance, Goodman made the following points:

- In supervision, she is unfocused, does not seem to grasp concepts and introduces irrelevant and unrelated material.

- She cannot follow a line of thought, process it nor carry it out to a logical conclusion.

- [T]he process of supervision does not seem to be effective in ameliorating her deficits, given her lack of capacity to appropriately absorb and process the supervision and give relevant feedback.

- She has many silly, giddy, inappropriate mannerisms which are quite disconcerting.

- She appears to have a significant cognitive processing impairment which interferes with her learning capabilities and, of course, her performance as a child psychiatrist/therapist.

- [She] lacks the usual expected competency of a first year Child Psych[iatry] Fellow.

Fornari Aff., Ex. 4. Goodman later informed Fornari that Reyes had failed to prepare reports on five patient consultations that had taken place in August, September and October, 1999.

Based on these reports, Fornari decided to limit Reyes' workload by placing a temporary moratorium on new intake evaluations assigned to her; the problems nevertheless persisted. On November 18, 1999, Goodman reported that she had received more complaints regarding Reyes "than I have sum total in all the year of supervising." Fornari Aff., Ex. 5.

Negative reports of Reyes' performance were not limited to her supervisors. On December 10, 1999, a psychology extern wrote to express her "difficulty and frustration

5

in working with [Reyes] on a case that [she] referred for a psychiatric evaluation." Fornari Aff., Ex. 5. In addition, the Coordinator of Children's Services for the Mental Health Association of Nassau County – an organization that frequently referred clients to North Shore – wrote Fornari to complain that Reyes had not come to work on the day of a scheduled appointment. Fornari Aff., Ex. 6. When Fornari asked Reyes why she missed the appointment, she told him that "it was kind of an emergency," and that she had simply assumed that another doctor would see the patient in her absence. Fornari Aff., ¶ 16.

In December 1999, three of Reyes' supervisors submitted formal performance evaluations. On these evaluations, a rating of "2" corresponded to "Needs Improvement: In general meets reasonable expectations, but sometimes falls short." Fornari Aff., Exs. 7-9. Reyes received an overall rating of less than 2 on each of the three evaluations submitted.[3] The comments on the evaluations reflected some improvement, particularly in the area of punctuality, but generally expressed continued concern with Reyes' performance.

On December 23, 1999, Fornari extended Reyes' academic probation to January 31, 2000. On January 21, 2000, Reyes' fourth supervisor (Stempler) submitted his evaluation, giving her an overall rating of 2; he commented that Reyes had a good command of psychopharmacology, but that she was "not well organized" and that supervision was "crisis management with little direction toward comprehensive information." Fornari Aff., Ex. 12. In addition, Goodman and Loo submitted "Resident Evaluation Forms," which are used "if, in the opinion of his/her supervisor(s), the resident

---

[3]Although a 2 is the lowest rating described on the evaluation score, Reyes' supervisors each indicated that she fell below this minimum standard: Goodman gave Reyes a "-2," Papilsky gave her a "<2" and Loo gave her a "1+." Fornari Aff., Ex. 7-9.

has not sufficiently demonstrated professional and personal attributes for meeting the standards of professionalism required for good medical/psychiatric practice." Fornari Aff., Exs. 11, 13. In those forms, Goodman and Loo identified several specific areas in which Reyes' performance was inadequate.

At some point before Reyes' academic probation expired, Fornari informed her that "the supervisors did not feel that [she] was well-suited for child and adolescent psychiatry, and the clinical performance did not improve, and that based on that, it was not likely that [she] would pass the academic probation." Fornari Dep. at 98. He then described various scenarios to her: "One would be not passing probation and facing termination of employment"; another was that "[she] did have the right to resign if she chose to." *Id.* at 98-99.

On January 30, 2000 – the day before Reyes' academic probation was to expire – Fornari received a letter in which Reyes offered to submit a letter of resignation. The offer was subject to several conditions:

1. A written agreement in which [North Shore] agrees to keep confidential the particular facts and circumstance surrounding my employment and subsequent departure from employment.

2. [North Shore] agrees to furnish me with two good letters of recommendation plus a positive letter of recommendation from the Director of the training program.

3. Any verbal communication from [North Shore] has to be consistent with the three letters of recommendation mentioned above.

4. The Director of the Residency program will agree in writing to give me six months of credit towards completion of fourth year psychiatry residency as mentioned in the Graduate Medical Education manual.

5. In addition, I promise not to disparage the reputation of [North

7

Shore]. In return, [North Shore] will not disparage me.

Fornari Aff., Ex. 14. Fornari informed Reyes that he would not accept those conditions.

On January 31, 2000, Fornari received a second letter from Reyes. In that letter, Reyes thanked Fornari for his efforts in getting her into the CAP program and then resigned, effective February 11, 2000. Reyes stated that she was resigning "for personal reasons." Fornari Aff., Ex. 15.

## II.

Reyes claims that she was discriminated against on the basis of her national origin.[4] In support of her claim, she points to four incidents that she alleges demonstrate bias against Filipinos:

First, Fornari asked the husband of one of the residents in another program to bring his toddler to one of the CAP residents' child-development classes. Reyes could "visibly see" that the husband, who was Filipino, was not comfortable with the request, but felt that he couldn't refuse. Reyes Dep. at 36. According to Reyes, the husband's discomfort was "cultural" and Fornari was not sensitive to it. *Id.*

Second, Fornari told the CAP residents about a Filipino boy he had evaluated as a resident twenty years ago. The boy was born in the Phillippines; when he was three, his father came to the United States and left him to be raised by his paternal grandparents.

---

[4]Reyes also claims that she was discriminated against on the basis of her race, gender, age, perceived disability, color and religion. On October 2, 2002, the Court dismissed those claims as untimely because Reyes failed to file her complaint within 90 days after receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") on those claims. Reyes received a second right-to-sue letter regarding her claim of national-origin discrimination and filed her complaint within 90 days of receipt of that letter.

8

When he was 10 or 11, his father sent for him. After arriving in the United States, the boy became depressed and had suicidal thoughts. Fornari opined that the boy was depressed because the psychological attachments he had formed with his grandparents had been broken; he recommended that the boy be returned to the Phillippines. Reyes felt that Fornari's recommendation was "rash" and "insensitive" because, "[in] the Filipino culture, it's normal for a little child to be raised by a grandmother while the parents are establishing themselves." Reyes Dep. at 37-38.

Third, Fornari suggested that Reyes move in with Dahar, her fellow resident in the CAP program. According to Fornari, he made the suggestion because he understood that Reyes was considering looking for an apartment closer to North Shore and Dahar was looking to share an apartment. Reyes, who is Catholic, was offended that Fornari would suggest that she live with a man she was not related to. According to Reyes, Fornari also said, "[A]fter all, he's Pakistani and you're Filipino, what's the difference?" Reyes Dep. at 46.

Fourth, according to Reyes, Fornari, Goodman and "maybe" Papilsky referred to her as having a "blunted affect." Reyes Dep. at 41. Medically speaking, a blunted affect (also known as a "flat affect") is a "severe reduction in emotional expressiveness," often associated with depression and schizophrenia. *See* http://www.medterms.com/script/main/art.asp?articlekey=26293 (last visited August 5, 2005). Reyes, however, felt that the reference was "culturally insensitive" to Filipinos because "[m]ost oriental people have a round face and sometimes the expression is sort of not showing a lot of emotion." Reyes Dep. at 44-45.

9

Fornari denies that Reyes' national origin played any part in his decisions and actions regarding her residency. He points out that the year before Reyes began her residency, Dr. Caroline Tan – another doctor of Filipino descent – successfully completed her residency in the CAP program.

## DISCUSSION

Reyes' Title VII claim of national-origin discrimination is analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). First, she must establish a *prima facie* case of unlawful employment discrimination by showing that she (1) was a member of a protected class, (2) was qualified for her position, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001). The Second Circuit has described this burden as "minimal," *Byrnie*, 243 F.3d at 101, and "*de minimis.*" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.2001).

The adverse employment action alleged here is constructive discharge. "An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [she] is forced to quit involuntarily," *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); working conditions are "intolerable" if they are such that "a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 152.

If a *prima facie* case has been established, "the burden shifts to the defendant,

which is required to offer a legitimate, non-discriminatory rationale for its actions." *Id.* at 138. If the defendant does so, then "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000) (citations and internal quotation marks omitted).

Thus, "once the defendant has made a showing of a neutral reason for the complained of action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Terry*, 336 F.3d at 138 (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997)). In other words, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

The court must "examin[e] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 148). Whether the plaintiff can satisfy that burden in a particular case depends on a number of factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49

11

A Title VII claim is subject to the usual rules regarding summary judgment, under which the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). However, conclusory statements, conjecture and other types of unsupported assertions are not sufficient to defeat an otherwise proper motion for summary judgment. *See Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14 (2d Cir. 1995).

As the Second Circuit has recently observed, summary judgment in a Title VII case should be granted with caution "because 'smoking gun' evidence of discriminatory intent is rare and most often must be inferred." *Forsyth v. Federation Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005). Moreover, since Reyes is proceeding *pro se*, the Court is mindful of its obligation to liberally construe her submissions to raise the strongest arguments that they suggest. *See id.* Nevertheless, summary judgment is appropriate – even in a Title VII action by a *pro se* plaintiff – when "the moving party has submitted facts sufficient to show that the non-moving party's claim has no merit, and the non-moving party's attempts to rebut the movant's facts consist only of 'mere allegations or denials' of the facts asserted by the movant." *Id.* at 570 (quoting Fed. R. Civ. P. 56(e)).

### I. *Prima Facie* Case

It is undisputed that Reyes is a member of a protected class. The Court also assumes, but does not hold, that Reyes was qualified for her position and suffered an adverse employment action in the form of a constructive discharge.

12

Reyes nevertheless fails to make out a *prima facie* case under Title VII because she cannot establish that her constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her national origin. Other than conclusory allegations, she relies on the four incidents described *supra* to show that Fornari was biased against Filipinos; however, those incidents are insufficient to give rise to an inference that she was constructively discharged because she is Filipino.[5] For example, that Fornari asked the husband of a Filipino couple to bring their child to a child-development class evidences no bias against Filipinos; it is simply irrelevant to the issue. There is, moreover, no evidence that Fornari's 20-year-old recommendation to return a depressed Filipino boy to his grandparents was motivated by anti-Filipino animus, as opposed to purely professional judgment. Similarly, there is no indication that Reyes' supervisors' comments that she had a "blunted affect" had anything to do with her national origin.

Fornari's alleged comment that "he's Pakistani and you're Filipino, what's the difference?" could arguably be construed as demonstrating a bias against ethnic minorities in general (or, as Reyes claims, against Asians in particular).[6] It is, however, a single stray remark having no apparent connection to Reyes' participation in the CAP

---

[5]Because Fornari was largely responsible for Reyes' admission into the CAP program, North Shore invites the Court to apply the principle that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire, [especially when] the firing has occurred only a short time after the hiring." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). Since the Second Circuit has expressly declined to pass judgment on whether this "same actor inference" applies in Title VII cases, *see Feingold v. New York*, 366 F.3d 138, 155 n.15 (2d Cir. 2004), the Court declines the invitation.

[6]Of course, this assumes that Fornari actually made the comment; at this stage of the litigation, the Court must resolve any dispute on that issue in Reyes' favor.

program; "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson*, 239 F.3d at 468; *see also Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998) (both citing *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir. 1994), abrogated on other grounds by *Schnabel*, 232 F.3d at 90).[7] Apart from this remark, Fornari's suggestion that Reyes share an apartment with Dahar demonstrates no bias against Filipinos (or any other nationality).

## II. Pretext

Even assuming that Reyes could make out a *prima facie* case, her Title VII claim would still fail. North Shore has come forward with a non-discriminatory reason justifying its employment decisions: Reyes' performance. Thus, the Court must "examin[e] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel*, 232 F.3d at 90 (quoting *Reeves*, 530 U.S. at 148).

As previously explained, Reyes' claim is based on four incidents, only one of which even arguably evidences unlawful bias. Even if that incident were enough to make out a *prima facie* case, her claim would be extremely weak.

In response, North Shore has submitted a lengthy, detailed and well-documented chronology of problems with Reyes' performance that easily justifies its employment decisions. In addition, it points out that another Filipino resident successfully

---

[7]Such remarks cannot be deemed "stray" – and therefore may be submitted in support of a claim of discrimination – when "other indicia of discrimination are properly presented." *Danzer*, 151 F.3d at 56. As explained in the text, Reyes offers no other indicia of discrimination.

14

completed the CAP program under Fornari's auspices.

Although Reyes claims that the performance issues catalogued by North Shore were a pretext for unlawful discrimination, she offers no adequate factual support for that claim. Her reliance on the previously described incidents involving Fornari is unavailing; most – if not all – of the concerns about Reyes' performance were initially voiced by individuals other than Fornari. Reyes offers no evidence suggesting that those individuals harbored any anti-Filipino bias.[8] Reyes claims that those expressing concerns about her performance were part of a conspiracy led by Fornari, but there is absolutely no evidence to support such a claim.

Reyes advances several other arguments in support of her claim of pretext. First, she argues that the lack of any complaints prior to September 24, 1999, supports her claim. This argument misstates the record; Fornari's memorandum detailing the issues addressed at the September 24 supervisors' meeting expressly notes that concerns had been expressed "[d]uring the past three months." Fornari Aff., Ex. 2.

Reyes next argues that the favorable letters of recommendation from Bronx-Lebanon "paint the exact opposite picture of plaintiff, her strengths, and performance characterizations than those at [North Shore]." Aff. in Opp., ¶ 9. She does not, however, offer any evidence to refute the specific factual bases for the concerns about her performance at North Shore; in the absence of any such evidence, the fact that Bronx-Lebanon and North Shore held different opinions about the quality of her performance is

---

[8]As previously explained, there is no evidence that Reyes' supervisors' references to a "blunted affect" had anything to do with her national origin. In any event, at most, two of Reyes' four supervisors made such a reference.

15

immaterial.

Finally, Reyes argues that Fornari's decision to place her on academic probation – instead of forbidding her from treating patients or terminating her outright – supports her claim of pretext. Even taken in the light most favorable to Reyes, however, this fact suggests nothing more than a professional judgment about the appropriate remedy given the nature of the concerns about her performance.

In sum, no reasonable fact-finder could conclude that North Shore intentionally discriminated against Reyes because of her national origin. North Shore is, therefore, entitled to summary judgment.

## CONCLUSION

North Shore's motion for summary judgment is granted and Reyes' complaint is dismissed.

FREDERIC BLOCK
United States District Judge

Brooklyn, New York
August 15, 2005